ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

FILED-USDC-NDTX-DA
'26 JUN 17 PM 4:25

UNITED STATES OF AMERICA

v.

JASON CHARLES MARENO
    a/k/a Dr. J.  (03)

DAVID LEE LLOYD (04)

JASON KASHOU (05)

DUC NGOC LY
    a/k/a MICHAEL LY
    a/k/a MONEY MIKE (06)

CRIMINAL NO. 3:23-CR-381-E

**[Supersedes indictment returned on June 24, 2025]**

## SUPERSEDING INDICTMENT

The Grand Jury charges:

At all times material to this Superseding Indictment:

### Introduction

1.    Damon Heath Roberts owned and controlled JDS LABS, LLC ("JDS Labs"), a limited liability company with a principal place of business in the Northern District of Texas. JDS Labs purported to offer "no cost" COVID-19 home tests that could be shipped to individuals nationwide.

2.    Gary Martin was a managing member of SVAL, LLC d/b/a Aim Diagnostic Laboratory ("SVAL"), a limited liability company with a principal place of business in McKinney, Texas. SVAL purported to offer "no cost" COVID-19 home tests that could be shipped to individuals nationwide.

Superseding Indictment—Page 1

3.   **Jason Charles Mareno**, a/k/a Dr. J., was a resident of Irving, Texas, and a licensed chiropractor practicing in the Northern District and elsewhere, and the owner of AD Precision Medical LLC.

4.   **David Lee Lloyd** was a resident of Meridian, Mississippi, and the owner of Elite Marketing LLC.

5.   **Jason Kashou** was a resident of Coral Springs, Florida, and the owner of MCM Hustle LLC.

6.   **Duc Ngoc Ly**, a/k/a Michael Ly, a/k/a Money Mike, was a resident of Frisco, Texas, and was the Chief Financial Officer of a business that operated multiple dental clinics in the Northern District of Texas and elsewhere, and the owner of B3C Partners LLC and One-6-Eaight Consulting LLC.

7.   Beginning on or about February 2023, and continuing to at least on or about August 2023, Roberts, Martin, **Mareno**, **Lloyd**, **Kashou**, **Ly**, and others known and unknown to the Grand Jury engaged in an unlawful conspiracy whereby: (a) Medicare was billed for over-the-counter COVID-19 tests that were shipped to Medicare beneficiaries who never requested them, and for tests that, in many instances, were never shipped to the Medicare beneficiaries; (b) illegal kickbacks and bribes were offered, paid, solicited, and received in amounts based on Medicare's reimbursement for the tests; and (c) Medicare beneficiary identification numbers were purchased, sold, and distributed to be used in the conspiracy.

Superseding Indictment—Page 2

The Medicare Program

8.     The Medicare Program ("Medicare") was a federally funded health insurance program, affecting commerce, that provided benefits to individuals who were 65 years and older and to certain disabled persons.  Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS").  Medicare was a "health care benefit program" as defined in 18 U.S.C. § 24(b), in that it was a public plan or contract affecting commerce, and a "Federal health care program" as defined by 42 U.S.C. § 1320a-7b(f).

9.     Individuals who qualified for Medicare benefits were referred to as Medicare "beneficiaries."  Each Medicare beneficiary was issued a unique Medicare identification number.

10.     Laboratories, pharmacies, physicians, and other health care providers that furnished items and services to Medicare beneficiaries were referred to as Medicare "providers."  To participate in Medicare, providers were required to submit a Medicare enrollment application, which required providers to certify that they would abide by Medicare laws, regulations, and program instructions, including the Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).

11.     Medicare paid for claims only if the items or services were (a) medically necessary for the treatment or diagnosis of the beneficiary's illness or injury, (b) documented, and (c) actually provided as represented.  Medicare did not knowingly pay for items or services that were procured through kickbacks and bribes.

<u>Over-the-Counter COVID-19 Tests</u>

12.    Starting on or about April 4, 2022, and continuing through the duration of the COVID-19 public health emergency, Medicare covered and paid for over-the-counter COVID-19 tests ("OTC COVID-19 tests") at no cost to Medicare beneficiaries provided the tests were approved, authorized, or cleared by the U.S. Food and Drug Administration.

13.    Medicare would not pay for more than eight OTC COVID-19 tests, per calendar month, per Medicare beneficiary.  Providers could distribute OTC COVID-19 tests only to Medicare beneficiaries who requested them.  Providers were required to keep documentation showing a Medicare beneficiary had requested tests to be sent to them.

<u>Count One</u>
Conspiracy to Offer, Pay, Solicit, and Receive Illegal Kickbacks
(Violation of 18 U.S.C. § 371 (42 U.S.C. § 1320a-7b(b))

14.    The Grand Jury realleges and incorporates by reference all preceding paragraphs of this Superseding Indictment as if fully set herein.

15.    Beginning on or about February 2023 and continuing to at least on or about August 2023, in the Northern District of Texas and elsewhere, the defendants, **Jason Charles Mareno**, **David Lee Lloyd**, **Jason Kashou**, and **Duc Ngoc Ly** knowingly and willfully conspired, confederated, and agreed with each other and with Damon Heath Roberts, Gary Martin, and others known and unknown to the Grand Jury, to commit offenses against the United States, that is (a) to knowingly and willfully solicit and receive remuneration (including any kickback, bribe, or rebate) directly and indirectly, overtly and covertly, in cash and in kind, in return for referring an individual to a person for the furnishing and arranging for the furnishing of Medicare-covered OTC COVID-19 tests, and in return for purchasing, ordering, and arranging for and recommending purchasing, and ordering Medicare covered OTC COVID-19 tests, and (b) to knowingly and willfully offer and pay remuneration (including any kickback, bribe, or rebate) directly and indirectly, overtly and covertly, in cash and in kind, to any person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of Medicare-covered OTC COVID-19 tests, and to purchase, order, and arrange for and recommend purchasing, and ordering Medicare covered OTC COVID-19 tests in violation of 42 U.S.C. § 1320a-7b(b).

## Object and Purpose of the Conspiracy

16.     It was an object and purpose of the conspiracy for the defendants and their coconspirators to unlawfully enrich themselves through the submission of false and fraudulent claims to Medicare for OTC COVID-19 tests that were procured by kickbacks and bribes, and in many instances, never requested or not received, and to conceal their fraud and kickbacks from HHS, CMS, Medicare, and law enforcement.

## Manner and Means of the Conspiracy

17.     The manner and means by which the defendants and their coconspirators sought to accomplish the purpose of the conspiracy included, among other things:

18.     **Mareno**, **Lloyd**, **Kashou**, and **Ly** gave patient names and identifying information, including Medicare identification numbers, to Roberts and Martin so that JDS Labs and SVAL could bill Medicare for OTC COVID-19 tests on behalf of Medicare beneficiaries.

19.     **Mareno**, **Lloyd**, **Kashou**, and **Ly** solicited and received kickbacks directly and indirectly from Roberts and Martin in return for referring these individuals to JDS Labs and SVAL to obtain OTC COVID-19 tests, and Roberts and Martin offered and paid kickbacks directly and indirectly to **Mareno**, **Lloyd**, **Kashou**, and **Ly** to induce them to refer these individuals to JDS Labs and SVAL to obtain OTC COVID-19 tests.

20.     The defendants and their coconspirators participated in this exchange of Medicare patient information notwithstanding the fact that they knew the patients had not consented to the sharing of their information and had not requested any OTC COVID-19 tests.  In fact, in numerous instances, the Medicare beneficiary was deceased.

21.    Roberts kept track of the Medicare reimbursements and the corresponding kickback amounts that were due to each defendant and kept them updated of the same.

22.    Ultimately, as a result of the illegal kickbacks and bribes, JDS Labs submitted nearly $4 million, and SVAL submitted more than $69 million, in false and fraudulent claims for OTC COVID-19 tests to Medicare.

23.    The defendants and their coconspirators sought to conceal their illegal kickback payments by distributing the kickbacks through a series of financial transactions and by paying some of the kickbacks in cash.

Overt Acts in Furtherance of the Conspiracy

24.    In furtherance of the conspiracy, and to accomplish its object and purpose, the defendants and their coconspirators committed and caused to be committed, in the Northern District of Texas and elsewhere, the following overt acts, among others:

a.    On or about March 2, 2023, Martin, as managing member on behalf of SVAL, and Roberts, as managing member on behalf of JDS Labs, executed a sham "Laboratory Services Agreement" whereby JDS Labs agreed to pay SVAL $34 for each set of OTC COVID-19 tests sent to Medicare beneficiaries.

b.    In an attempt to make their illegal kickback arrangement appear legitimate, **Mareno** and Roberts executed a marketing agreement on or about March 3, 2023.  The agreement provided that, **Mareno**, through his company, would be paid an amount per test kit successfully billed to Medicare as a result of his referrals to Roberts and Martin.

c. In an attempt to make their illegal kickback arrangement appear legitimate, **Ly** and Roberts executed a marketing agreement on or about March 8, 2023. The agreement provided that **Ly**, through his company, would be paid an amount per patient for each test kit successfully billed to Medicare as a result of his referrals to Roberts and Martin.

d. On or about March 10, 2023, **Ly** emailed Roberts an Excel spreadsheet titled "2023 Patient Demographic Report.xlsx."

e. On March 10, 2023, Roberts sent an email to **Mareno** and others with the subject "Re: Clarification" and stated, "I also wanted you to know that we are allowed to ship tests to your patients monthly and the program ends on May 11, so If you get me your patients today, we will be able to ship 3 times to each of them. If you wait until Monday, we will only be able to ship your patients 2 times since it will be within 60 days from May 11."

f. On or about March 21, 2023, Roberts emailed **Ly** and requested that **Ly** provide dates of birth for patients in order to submit insurance claims for the OTC COVID-19 tests.

g. On or about March 22, 2023, **Ly** emailed Roberts an updated Excel spreadsheet titled "2023 Patient Demographic Report updated 03.22.23.xlxs," which contained the patients' dates of birth.

h. In an attempt to make their illegal kickback arrangement appear legitimate, **Lloyd** executed a marketing agreement with an individual

acting as an intermediary between **Lloyd** and Roberts on or about March 31, 2023. The agreement provided that **Lloyd**, through his company, would be paid an amount per test kit successfully billed to Medicare as a result of his referrals to Roberts and Martin.

i. On April 3, 2023, Roberts sent an email to Martin with the subject "April 1 breakdown - $25,738.00" that included a table showing $3,038.00 associated with one individual, $5,880.00 associated with "Dr. J." and $16,830.00 associated with "Gary Martin." Roberts then stated, "Let's meet up tonight and sign the lab reference agreement. You can come up to our unit tonight and have a drink or I can meet you in the lobby."

j. On or about April 14, 2023, **Lloyd** received a wire transfer from SVAL in the amount of $20,000.00.

k. On April 17, 2023, Roberts sent an email to **Mareno** with the subject line, "April 1 – 15" and stated, "Dr. J, Here is what we have received payment on from April 1 – 15." Attached to the email was an Excel spreadsheet containing patient names, addresses, and dates of birth.

l. On or about April 18, 2023, **Mareno** received a wire transfer from SVAL in the amount of $10,064.00.

m. On May 1, 2023, Roberts sent an email to **Lloyd** with the subject "38,330" and stated, "Yesterday I added up all the lists we have received from Jason [**Kashou**] and [another individual]. Please confirm this is correct and I'm not missing anything." The email included a

table indicating Elite Marketing had provided 15 files that included a total of 34,737 patients and that another individual had provided 3,593 patients, totaling 38,330 patients. The same day, **Lloyd** forwarded the email to **Kashou**, and **Kashou** replied to **Lloyd** and Roberts stating, "Good day, The numbers are correct."

n. On May 9, 2023, **Lloyd** received a wire transfer from SVAL in the amount of $80,000.00.

o. On May 12, 2023, **Kashou** received wire transfer from **Lloyd** in the amount of $20,000.00.

p. On June 14, 2023, Roberts sent an email to **Kashou** and **Lloyd** stating, "I put a file in your folder called VOICEMAILS. It contains around 12,300 patients. We accidently shipped them 8 rapids before calling them. Can you call these patients and make sure they received their 8 rapids and they are happy. You will need to educate them that under the Public Health Emergency these are tests are completely no cost to them and their insurance company paid for them and there is zero co-pay or any out of pocket expense. And it does not affect their deductible. I think the price we agreed on is $8 per hour plus $8 for each YES you receive."

q. On July 1, 2023, **Lloyd** sent an email to Roberts with the subject, "Gary" and stated, "Morning Damon, Any word from Damon regarding payments? Thanks, David." Roberts replied to **Lloyd** the next day

stating, "Not yet.  But our billing company said Medicare will not be doing anything July 1 – 4. So I don't expect anything could happen until Wednesday."

r.  On July 7, 2023, **Lloyd** sent an email to Roberts with the subject line "5583 total paid" and stated, "Morning Damon, Since started 5583 has been paid to the lab from your last reports for [Elite Marketing].  Can you release payments on these clients,until you and Gary release the upcoming payments?"

s.  On July 9, 2023, **Lloyd** sent an email to Damon with the subject line "Payments" and stated, among other things, "Medicare has paid… I told you I was looking for a trust worthy LAb and it's not being good at this point[.] It's 2 Months in and I know Medicare has paid.  Medicare pays 21 Days easy.. Pay this week guys.. We have paid out a lot of money to produce 100,000 Plus patients..just under stand we are in the []hole." Roberts replied to **Lloyd** the following day and stated, "David, You can also call Dr. J.  I know Dr. J talks with Gary a lot."

t.  On or about July 26, 2023, **Ly** received approximately $3,100 in cash as payment of a kickback based on claims paid from the patient information he provided to Roberts.

u.  On August 6, 2023, **Kashou** sent **Lloyd**, Roberts, and others an email with the subject line "Re: need 2 things" and stated, among other things,

"The audio for Betty [Last Name] is a man's voice.  Her DOB is [XX/XX/28]."

    v.  On August 7, 2023, Roberts sent an email to **Kashou** and **Lloyd** with the subject line "need 2 audio's asap" and stated among other things, "Betty [Last Name] – the one you sent is a man's voice."

All in violation of 18 U.S.C. § 371 (42 U.S.C. § 1320a-7b(b)).

## Forfeiture Notice
(18 U.S.C. § 982(a)(7))

25.    Pursuant to 18 U.S.C. § 982(a)(7), upon conviction of the offense alleged in Count One, the defendants shall forfeit to the United States, any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

26.    The above-referenced property subject to forfeiture includes, but is not limited to, a "money judgment" in the amount of U.S. currency constituting the gross proceeds traceable to the offense.

27.    Pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c), if any of the property described above, as a result of any act or omission of the defendants:

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third party;

c.    has been placed beyond the jurisdiction of the court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which cannot be divided without difficulty,

the United States intends to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described above.

**Superseding Indictment—Page 13**

A TRUE BILL:

_____
GRAND JURY FOREPERSON


RYAN RAYBOULD
UNITED STATES ATTORNEY

_____
DOUGLAS B. BRASHER
Assistant United States Attorney
Texas Bar No. 24077601
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone: 214-659-8604
Facsimile:  214-658-8802
Douglas.Brasher@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

THE UNITED STATES OF AMERICA

v.

JASON CHARLES MORENO
a/k/a Dr. J. (03)
DAVID LEE LLOYD (04)
JASON KASHOU (05)
DUC NGOC LY
a/k/a MICHAEL LY
a/k/a MONEY MIKE (06)

SUPERSEDING INDICTMENT

18 U.S.C. § 371 (42 U.S.C. § 1320a-7b(b)(1))
Conspiracy to Offer, Pay, Solicit, and Receive Illegal Kickbacks
(Count 1)

18 U.S.C. § 982(a)(7)
Forfeiture Notice

1 Counts

A true bill rendered

--------------------------------------------------------------------------------
DALLAS                                                                FOREPERSON

Filed in open court this **17** day of June, 2026.

**Warrant to be Issued for all Defendants**
--------------------------------------------------------------------------------

UNITED STATES MAGISTRATE JUDGE
Criminal Case Pending: 3:23-CR-381-E